OPINION OF THE COURT
Charles Edward Ramos, J.
Defendant Xerox Corporation (Xerox) moves for an order (i) dismissing the complaint, pursuant to section 7 of the Year 2000 Readiness and Responsibility Act (15 USC § 6601 et seq., added by Pub L No. 106-37,106 US Stat 185), CPLR 327 (forum non conveniens), CPLR 3211 (a) (4) (prior action pending), and CPLR 3001 (discretion to hear declaratory judgment action); or (ii) staying all discovery for the time period set forth in section 7 (f) of the Year 2000 Readiness and Responsibility Act (15 USC § 6606 [f]) (Y2K Act); or (iii) entering a stay pending final judgment in an action pending in the Superior Court of Connecticut pursuant to CPLR 327 and 3211 (a) (4).
Plaintiff American Guarantee and Liability Insurance Company (AGL) is a New York corporation, with places of business in New York and Illinois. AGL is a New York domiciliary insurer and is subject to the regulations of the New York Superintendent of Insurance. Xerox is a New York corporation with major operating centers located in Rochester, New York. Xerox’s corporate headquarters is located in Stamford, Connecticut.
AGL issued a first-party property insurance policy (Policy) (No. TOP 82 24 313) to Xerox with an effective period from March 31, 1996 through March 31, 1999, which was extended by endorsement to March 31, 2000. The insured entities under the Policy include Xerox and its subsidiaries around the world, and the Policy covers property both in and outside the United States. The Policy provides coverage for “all risk of direct physical loss of or damage to property described herein * * * [including] any destruction, distortion, or corruption of any computer data, coding, program or software except hereinafter excluded” (Policy If 9). By letter dated March 17, 1999, Xerox submitted a notice of claim under the Policy for its ‘Wear 2000 remediation expenses and/or damages.” AGL acknowledged receipt of the claim by letter dated April 7, 1999. On April 28, 1999, AGL notified Xerox that it was commencing an investigation, enclosed a proof of loss form, and requested that Xerox *413 complete and file the form “within 60 days of the date of this letter.” On July 26, 1999 Xerox sent AGL a purported “First Partial Proof of Loss.”
AGL commenced the instant action on July 1, 1999, seeking (i) a declaration that Xerox is not entitled to coverage under the Policy based on its failure to comply with the notice provisions of the Policy, and to submit a proof of loss, and (ii) a determination regarding the rights and obligations of the parties with respect to whether coverage exists for year 2000 related costs. With respect to the coverage issue, the complaint alleges that the year 2000 related costs are “ordinary business expenses, and are not within the scope of coverage under the Policy” (complaint 15). The day after AGL commenced the instant action, Xerox filed an action against AGL in the Superior Court of the State of Connecticut for the Judicial District of Stamford/ Norwalk. Xerox seeks both affirmative and declaratory relief in the Connecticut action.
By letter dated August 2, 1999, Xerox sent AGL a letter indicating that it had elected to treat the New York complaint as a prelitigation notice under Y2K Act § 7 (15 USC § 6606). AGL rejected Xerox’s attempt to cast the New York action as falling under the Y2K Act. In addition, AGL noted that Xerox affirmatively filed an action in Connecticut seeking a judicial resolution of the parties’ dispute. AGL has argued that the Y2K Act was passed after this action was commenced and the prelitigation commencement provisions should not govern actions which were commenced prior to the execution of the statute.
Xerox’s contention that the action should be either dismissed or stayed pursuant to the Y2K Act (15 USC § 6601 et seq.) is rejected. The Y2K Act was developed as a Federal response to the prospect of increased civil litigation resulting from Y2K failures. A Y2K failure has been defined by commentators as consisting of a “disruption and malfunction of systems and operations that depend upon and use date-coded information in connection with time-sensitive computer systems.” (See, e.g., Kerr, Understanding, Preventing and Litigating Year 2000 Issues: Practical Strategies and Industry-Specific Solutions III— Developing Theories Of Y2K Liability In Litigation, 571 PLI/Pat 907, 914 [Westlaw 1999].) The problems concerning the Y2K date coding resulted from the use by early computer programmers of a two-digit number format, as opposed to a four-digit number format, to register the year in early programs to save memory space. (Alces and Book, When Y2K Causes *414 “Economic Loss” To “Other Property,” 84 Minn L Rev 1, 6-10 [Nov. 1999].) In programs using this space-saving coding, the calendar year “1950” would be registered as “50” {Ibid.). In those programs which contain this form of embedded coding, the date January 1, 2000 will be read by the computer system as being January 1, 1900. The inability to accurately register the correct dating is predicted to result in various types of system failures ranging from minor calculation errors to complete system collapses.
The Y2K Act was enacted on July 20, 1999 in anticipation of an increase in frivolous litigation which would result from minor Y2K failures. {See, 15 USC § 6601 [a] [7].) The Federal Government therefore promulgated the statute to address the prospect of an overwhelming wave of litigation with a structured system to promote the resolution of disputes arising out of Y2K failures. At issue in this motion is whether the Y2K Act was designed to also encompass insurance coverage litigation pertaining to issues of dispute regarding the alleged failure to provide a timely proof of claim. Neither the statute nor the legislative history supports a finding that insurance coverage disputes were designed to be encompassed within the framework of the Y2K Act.
A plain reading of the statute does not support a finding that the Y2K Act encompasses insurance litigation. As stated in the statute, the Act covers: “[A] civil action commenced in any Federal or State court, or an agency board of contract appeal proceeding, in which the plaintiff’s alleged harm or injury arises from or is related to an actual or potential Y2K failure, or a claim or defense arises from or is related to an actual or potential Y2K failure.” (Y2K Act § 3 [1] [A], 15 USC § 6602 [1] [A] [emphasis added].) The term “Y2K failure” is defined in the statute as: “[A] failure by any device or system (including any computer system and any microchip or integrated circuit embedded in another device or product), or any software, firmware, or other set or collection of processing instructions to process, to calculate, to compare, to sequence, to display, to store, to transmit, or to receive year-2000 date-related data.” {Id., § 3 [2], 15 USC § 6602 [2].) Indeed, the examples set forth in the statute concerning covered Y2K failures indicate that the Act was designed to cover litigation involving damage directly resulting from a Y2K failure. {See, Y2K Act § 3 [2] [A]-[C], 15 USC § 6602 [2] [A]-[C].) Based upon a plain reading of the statute, the Y2K Act is drafted to encompass lawsuits related to a failure to process year 2000 date-related data. The *415 instant suit is a contract-based action to determine whether an insured provided its insurer with a timely notice of claim and is not premised upon a Y2K failure.
The legislative history of the Y2K Act supports a finding that the statute was narrowly designed to address a narrow issue regarding Y2K failures. As stated by Congressman Conyers: “I can support this legislation because it represents a onetime Federal response to a unique nationwide problem relating to possible year 2000 computer failures and does not serve in any way as precedent for broader-ranging changes in our tort laws.” (145 Cong Rec H5196-01, H5197.) The legislative history relating specifically to prelitigation notice further undermines Xerox’s reliance on that section in the context of an insurance coverage action. Indeed, Congressman Conyers specifically addressed prelitigation notice by stating: “Section 7. Prelitigation Notice. — Y2K actions would not be permitted to proceed to trial until the defendant has had an opportunity to fix the Y2K failure within 90 days after receiving notice in writing with the problem described with particularity. The 90 day period includes an initial 30 day notice period, and a subsequent 60 day period in which to remedy the defect.” (Id., at H5198.) The issue of prelitigation notice was also addressed by Congressman Goodlatte who stated: “In addition, there are reforms that encourage folks to settle their differences outside of the courtroom: A 90-day cooling off period that is so important to allow a defendant who is made aware of a problem that somebody has in their computer system, in the machinery that is operating the manufacture of their products, whatever the case might be, they need to be given notice that the problem exists and then an ample amount of time to correct the problem. This bill does that.” (Id., at H5205.) The legislative history of the Y2K Act plainly indicates that the statute was only designed to encompass claims directly arising from Y2K failures and not collateral actions relating to, inter alia, insurance coverage claims.
The court further notes that even if the Y2K Act did apply to insurance coverage actions, Xerox by its own actions has waived any right it may have had to treat the New York complaint as prelitigation notice. Xerox affirmatively commenced litigation in Connecticut concerning the contractual dispute at issue in this action. As Xerox has elected to have the courts resolve the parties’ dispute, the Y2K Act’s prelitigation notice provision is not an instrument Xerox may employ simply to gain a strategic legal advantage in another forum. Based upon *416 the foregoing, the court determines that Xerox’s application to have this action stayed or dismissed pursuant to the Y2K Act is denied. .....
The doctrine of forum non conveniens permits a court to either dismiss or stay an action where it determines that, although jurisdictionally sound, the matter would more properly be adjudicated in another forum. (Islamic Republic of Iran v Pahlavi, 62 NY2d 474, 478-479 [1984], cert denied 469 US 1108 [1985].) The factors considered in determining a forum non conveniens motion includes (i) the residency of the parties; (ii) the potential hardship to proposed witnesses; (iii) the availability of an alternative forum; (iv) the situs of the underlying action; and (v) the burden which will be imposed upon New York courts. (Stamm v Deloitte & Touche, 202 AD2d 413 [2d Dept 1994]; see also, Neville v Anglo Am. Mgt. Corp., 191 AD2d 240 [1st Dept 1993].) No single factor is determinative and the motion is addressed to the sound discretion of the court. (Supra.) Based upon the proofs submitted by the parties on this motion, the application to either dismiss or stay this action is denied.
While Connecticut provides an alternative forum for the litigation of this action, Xerox has not convinced this court that it should exercise its discretion and dismiss the action from the plaintiffs chosen forum. (Sullivan v McNicholas Transfer Co., 93 AD2d 527, 531 [4th Dept 1983].) For instance, both AGL and Xerox are New York corporations which conduct business in New York. AGL is an insurer organized under the laws of the State of New York and subject to primary regulation by the Superintendent of Insurance. The witnesses for this action clearly reside, inter alia, in both New York and Connecticut. The Commercial Division of New York State Supreme Court, New York County, is designed to handle complex business actions which are national and international in nature. The burden of handling an action which includes, as an element thereof, a contract which may be interpreted in accordance with Connecticut law is relatively minor.* As either New York or Connecticut would be an equally convenient forum for this litigation, Xerox has not carried its burden on this branch of its motion. Therefore, Xerox’s motion to dismiss the action on forum non conveniens grounds is denied.
*417 This court declines to dismiss the action pursuant to CPLR 3211 (a) (4) based upon the Connecticut action. This court is empowered with broad discretion to determine whether an action should be dismissed based upon the existence of another action. (Whitney v Whitney, 57 NY2d 731 [1982].) However, Xerox has not convinced this court to exercise its discretion and dismiss this action in favor of the subsequently filed Connecticut action. This court likewise denies Xerox’s application that this court exercise its discretion not to hear a declaratory judgment action.
Accordingly, it is hereby ordered that defendant’s motion to either stay or dismiss the complaint is denied in its entirety.

 The court does not reach a determination as to whether Connecticut or New York law is applicable to interpreting the parties’ obligations under the insurance contract.